J-A29032-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| ERIC J. HALL, | : | |
| | : | |
| Appellant | : | No. 131 WDA 2014 |

Appeal from the Judgment of Sentence of December 17, 2013
in the Court of Common Pleas of Westmoreland County,
Criminal Division, at No(s): CP-65-CR-0000006-2012

BEFORE:    FORD ELLIOTT, P.J.E., ALLEN, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.:        **FILED DECEMBER 16, 2014**

Eric J. Hall (Appellant) appeals from the December 17, 2013 judgment

of sentence of life imprisonment entered after a jury convicted him of, *inter*

*alia*, two counts of first-degree murder.  18 Pa.C.S. § 2502(a).  We affirm.

The trial court summarized the evidence offered at trial as follows.

Anthony ("Tony") Henderson and Noelle Richards were a young
couple living at a residence located on Fox Road in Washington
Township, Westmoreland County.  The property was very rural
and was not immediately accessible from SR 66, the nearest
main road.  On August 28, 2011, at approximately 8:00 p.m.,
[Tony] and Noelle went to a Dairy Queen in nearby Delmont to
purchase food and ice cream cake to take back to their home.
They concluded the purchase and left the restaurant at 8:08
p.m.

Shortly thereafter, at approximately 8:30 p.m., the trio of
Michael DiVincenzo, Greg DiVincenzo and Sam Denillo traveled
[to] Tony and Noelle's house to purchase marijuana from Tony.
Michael testified that Sam Denillo drove the three of them to
Washington Township in his Black Jeep.  Michael had been to

Tony's house on a prior occasion with another friend, Paul Hoover, who was staying with Tony and Noelle, so he knew the way. Michael testified that on that prior occasion the gate at the top of the lengthy driveway had been closed, and Hoover had to open it and close it behind them. However, on this trip, the gate was already open, and they proceeded directly down the driveway to the rear of the house.

Michael DiVincenzo and Denillo approached the sliding glass doors off the back patio and knocked, but that no one answered. He could see the light from a television but because the glass was covered by vertical shades that were closed, he couldn't tell whether anyone was inside. Michael continued to knock at the sliding glass door, and also checked around the rest of the house to see if there were any lights on in another portion of the house. He also decided to call Paul Hoover to see if he knew where Tony was, but as he was talking with him, he saw that someone was coming to the door. The sliding glass door opened, and an unfamiliar man emerged holding a baseball bat. He immediately swung the baseball bat and hit Sam Denillo on the side of his head, and Denillo fell to the ground. The man then started toward Gregory DiVincenzo, swinging the bat at him as well, but Gregory was able to block the blow with his arm. Michael told him that they would just leave, but the man chased after Michael, who ran to get away from him. He gave up the chase after a short time, and went back inside the house. Intending to flee the area, Michael and Gregory DiVincenzo managed to get Sam Denillo back into the vehicle. Michael realized that he had lost his cell phone, and had Gregory call his number. Michael then noticed that the man had come back outside the house and was laying flat on his stomach as if he were searching for something. He stood up, and Michael could hear what sounded like his cell phone ringing from an area near the man's midsection. Michael asked the man to please throw him his cell phone, that they would just leave, but the man just stared at him blankly.

The trio left the Henderson property, driving down Fox Road to its intersection with SR 66, while Gregory DiVincenzo called 9-1-1 from the vehicle to summon medical help for Sam Denillo. The call was received by Westmoreland 9-1-1 at 8:44 p.m. Denillo was groggy and bleeding from his mouth. While they were waiting for the police and an ambulance, a dark

- 2 -

colored Jeep Grand Cherokee sped past them at a high rate of speed, made a left turn onto SR 66 without stopping at the stop sign, and drove off toward Delmont. Believing it to be the same person who had assaulted them, Gregory DiVincenzo called 9-1-1 again and reported his observations about the vehicle. This second call was received by Westmoreland 9-1-1 at 8:49 p.m. Denillo was flown by medical helicopter to Allegheny General Hospital in Pittsburgh, where he was admitted for three days, underwent surgery for a broken jaw, and treated for a concussion and bleeding in his ear.

Michael DiVincenzo later identified [Appellant] from a series of photos that were presented to him by members of the Westmoreland County Detective Bureau, and also at the time of trial, as being the bat-wielding individual who assaulted Sam Denillo and attempted to assault him and his brother on that evening. Sam Denillo had little or no memory of the events. Gregory DiVincenzo was unable to positively identify [Appellant's] photograph from the series of photos shown to him by the police, but he was able to make a positive identification of him at the preliminary hearing and at trial.

As the DiVincenzo brothers and Sam Denillo were waiting on the side of Fox Road for an ambulance, Corey Lutz and his friend Joe Giarusso, in separate vehicles, were turning from SR 66 onto Fox Road on their way to [Tony's] house. Lutz and Giarusso were both friends of Tony's and they had made plans earlier in the day to come to his house and visit that evening. Lutz noticed the three men in the Jeep parked at the intersection. When Lutz arrived at the Henderson home, he first noticed that the gate at the top of the driveway was not locked as it customarily was, and that it appeared to be damaged. When he reached the rear of the house, he noticed that the grill had been overturned into the driveway, furniture was out of place, there were broken items on the patio, and the sliding glass door was open. He noted that this was all unusual.

Lutz entered into the house through the sliding glass door and discovered the bodies of [Tony] Henderson and Noelle Richards in the finished basement living area. Lutz indicated that he believed that Noelle might have been breathing slightly, but that she wouldn't respond to him. He observed that she had blood on her head and was slumped over on the couch. He

related that he saw Tony Henderson's body lying on the floor by the coffee table in front of the fireplace in a large pool of blood. The food from Dairy Queen was still on the coffee table, and Lutz recalled that he could smell "fresh food, like, a hamburger with a bite taken out of it, a thing of French fries that wasn't even dipped into the ketchup yet....  I remember looking down and noticing that they didn't even get to eat."  He immediately called 9-1-1; the police received the dispatch while they were assisting the DiVincenzos and Sam Denillo at the intersection of Fox Road and SR 66.  Lutz's call was received by Westmoreland 9-1-1 at 8:56 p.m.

Forensic pathologist Dr. Cyril Wecht testified that Tony Henderson had sustained three gunshot wounds (two in his head and one in his forearm), and also had a multitude of wounds to his head that suggested he had been beaten with some sort of blunt force instrumentality.  Indeed, Dr. Wecht testified that the injuries suggested that he had received repeated blows, administered with substantial force, to the back of his head.  Dr. Wecht testified that the injuries inflicted upon Tony Henderson, other than the gunshot wounds, were consistent with a baseball bat being that blunt force instrumentality.  Dr. Wecht opined that these injuries would not have necessarily been fatal had Tony Henderson received prompt medical intervention and neurological treatment.  Dr. Wecht explained that the cause of death would have been "the multiplicity of all injuries producing an adverse effect as I have explained, then with focusing more on the two gunshot wounds of the head would have been the major injuries contributed to by the multiple lacerations leading to loss of blood and thereby hastening the development of shock and death."

Dr. Wecht also performed the autopsy on the body of Noelle Richards.  Dr. Wecht explained that she had also sustained three gunshot wounds, all to her head, as well as a laceration around her right ear that was caused by blunt force instrumentality.  He opined that Noelle would have died within thirty minutes of sustaining the fatal gunshot wounds to the head.  Dr. Wecht testified that Noelle Richards cause of death was "the three gunshot wounds of the head and face with some contribution from the laceration caused by a blunt force instrument of some kind in the right temporal region.  All of

those producing that trans-sellar fracture would have been the cause of her death."

During the initial investigation into the deaths of [Tony] Henderson and Noelle Richards, law enforcement had no suspects, as neither DiVincenzo brother nor Sam Denillo knew the identity of the bat-wielding man who attacked them on August 28, 2011. However, on August 29, 2011, Anna Stouffer found a black tri-fold wallet on the ground to the rear of her van, which was parked on the street outside her residence at 221 Church Street in Ligonier Borough. She knew that a red car had been parked behind her van the night before. She also knew that the red car was associated with the residents of 217 Church Street. Ms. Stouffer looked inside to see if she could identify the owner, and saw that the license belonged to an Anthony James Henderson. She did not know this person, so she took the wallet to the Ligonier Borough Police Department. The time was 2:25 p.m. on August 29, 2011.

Jeremy Springer, who worked with [Appellant] and [Appellant's] brother, Jay, testified that on August 29, 2011, [Appellant] had assisted him in removing a roof at his residence. [Appellant] arrived at approximately 7:00 a.m. in a green Jeep, and his brother arrived separately. As they worked on Springer's roof, [Appellant] kept receiving text messages on his cell phone. When asked who was contacting him, he stated it was his "guy from Delmont." Springer recalled that after [Appellant] had left for the day, he texted [Appellant] around 7:00 p.m. to thank him for coming out and helping with the roof. He noted that he did not receive a prompt response as usual, and did not receive another text from [Appellant] until approximately 9:45 p.m.

Springer also related that the next day, on August 29, 2011, [Appellant] reported for work as usual. Over the lunch break, when Springer and [Appellant] were eating together, [Appellant] told Springer a story that began with, "You won't believe what happened to me last night." [Appellant] then proceeded to tell Springer that he had gone to see his friend in Delmont, and that when he had gotten there, there were two dead people in the house. He said that he had gone to the back door when he got no response to his knocking at the front door, that he went in the back door and saw Tony on the floor with

what he thought was a gunshot wound, and Tony's girlfriend lying on the couch with dried blood on the side of her face. Not knowing what to do, and fearful that the person who had done this was still there, [Appellant] told Springer that he locked the back door. He then stated that he heard a car drive up, and was afraid, so he hid. He told Springer that he then heard Tony's phone ringing, and as he hid, he happened upon a baseball bat that was lying on the ground. He stated that he picked up the bat and unlocked the door, and said that he said, "hey" to the men he saw at the back door. [Appellant] told Springer that he thought he could get away, so he came out swinging the bat and thought he hit the bigger man in the head. He related that the men scattered, and he grabbed what one of them dropped and ran back inside the house. [Appellant] told Springer that he gabbed Tony's phone (because it had been ringing, and because he had contacted Tony earlier in the day and he didn't want his number to be on there when the police looked at it) and Tony's wallet (because he didn't know if he had touched it accidentally and his fingerprints might be on it.)

He told Springer that he then left the house and drove back toward Ligonier. He did tell Springer that on the way to Ligonier, he stopped at Donegal Lake, removed the batteries from the two cell phones that he had taken from the house, and threw them into the lake. He did this, he said, because he had seen on television that if the battery was removed from a phone, the phone couldn't be traced. He also told Springer that he had removed all of his clothing, including his shoes, had thrown them and the wallet into a garbage bag, and discarded them at a dumpster at a methadone clinic. He also related that he stopped at Walmart on the way home to buy Clorox and wiped his Jeep down in case there was any blood traces from his shoes or the clothing he had been wearing. He stated that he still had the bat, but days later told Springer that he had thrown it into the woods. Springer urged [Appellant] to speak with law enforcement, but [Appellant] stated that he wanted to wait to do that. Jeremy Springer testified that, after consulting with his attorney and telling her what [Appellant] had revealed to him, he contacted the County Detectives Bureau and told them about [Appellant's] "story."

Law enforcement verified that [Appellant] had visited the methadone clinic on Monday, August 29, 2011 at approximately

- 6 -

5:43 a.m. The Commonwealth also presented video footage from the Latrobe Walmart, showing that [Appellant] then visited that store at approximately 6:24 a.m., purchased cleaning materials and extensively cleaned his car in the Walmart parking lot. The bottle of Soft Scrub cleanser that [Appellant] purchased was recovered in a search of the teal/blue/green Jeep Cherokee that was driven by [Appellant] on the night of August 28, 2011. Also recovered from the Jeep were numerous blood samples, which were later matched through DNA analysis to Sam Denillo and [Tony] Henderson. Analysis of text messages on [Appellant's] phone indicated that he had borrowed a 9mm Taurus firearm from his mother but had not returned it and had in fact discarded it. Analysis of the bullet casings and fragments recovered at the scene of the murder indicated that the ammunition used was 9mm ammunition, likely used in a 9mm automatic firearm.

[Appellant] maintained that he had gone to [Tony] Henderson's home to purchase drugs, and that when he arrived at Tony's driveway, he was nearly run off the driveway by a large dark SUV/truck coming in the opposite direction. When he approached the back door, he noted that the dog was sniffing at something in the driveway. He saw it was a wallet, and picked it up. He also picked up a cell phone that was also on the ground. He noted that the patio area was in disarray. He entered the house and discovered the bodies of Noelle Richards and Tony Henderson. He observed that a vehicle had arrived at the house, and "guys started pouring out of it." He locked the back door, thinking that the people who had murdered Tony and Noelle had come back for him. He found a baseball bat at the end of the couch and decided to attack these individuals. He swung the bat at these individuals, hitting two of them. When he had chased them away, he searched the ground for a gun, and picked up something hard. He went back inside the house until these men left, and then departed, taking the cell phone, the wallet, the bat and the hard object with him. He testified that he gave no thought whatsoever to calling the police. He testified that he drove back to Ligonier, and when he was on SR 30, he threw the bat and the cell phones out the window. When he arrived home, he took a shower and discarded his clothing in a trash can that had been placed by the curb to be picked up in the morning. [Appellant] testified that he woke early the next morning for work, went to the methadone clinic in Greensburg,

and then stopped at Walmart in Latrobe so he could clean up the Jeep. [Appellant] stated that he had thrown up in the Jeep the night before, and needed to clean the vehicle before picking his brother up for work. [Appellant] also admitted that he had thrown away the 9mm Taurus firearm that he had borrowed from his mother so that the police would not find it.

Trial Court Opinion (TCO), 4/4/2014, at 1-9 (footnote and citations to the record omitted).

Upon this evidence, the jury convicted Appellant of the murders of Anthony Henderson and Noelle Richards, as well as of numerous other crimes. On December 17, 2013, the trial court sentenced Appellant, *inter alia*, to two consecutive terms of life imprisonment without possibility of parole. Appellant timely filed a notice of appeal. The trial court ordered Appellant to file a concise statement of errors complained of on appeal, which Appellant timely filed.

Appellant presents six questions for this Court's consideration:

> 1. Whether the court below erred in admitting evidence of *crimen falsi* convictions more than 10 years old, in violation of Pa.R.E. 609.
>
> 2. Whether the court below erred in allowing the Commonwealth to publish to the jury autopsy photographs of the victims on multiple occasions, creating a cumulative inflammatory effect.
>
> 3. Whether the court below erred in allowing hearsay testimony against the Appellant despite there being no applicable exception to the rule against hearsay, relating to the testimony in question.

4. Whether the court below erred in allowing the admission of text messages putatively from the Appellant despite a lack of sufficient evidence of authenticity.

5. Whether the court below erred in allowing a Commonwealth witness to testify regarding [Appellant's] refusal to speak to the police, which implicated his rights guaranteed by the Fifth Amendment and the Pennsylvania Constitution.

6. Whether the court below erred in allowing the Commonwealth to offer extrinsic evidence as to a collateral matter to impeach the Appellant.

Appellant's Brief at 5 (suggested answers omitted).

All of Appellant's questions challenge the trial court's evidentiary rulings. We consider these questions mindful of the following.

The standard of review for a trial court's evidentiary rulings is narrow. The admissibility of evidence is solely within the discretion of the trial court and will be reversed only if the trial court has abused its discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record.

*Commonwealth v. Mendez*, 74 A.3d 256, 260 (Pa. Super. 2013) (quoting

*Commonwealth v. Hanford*, 937 A.2d 1094, 1098 (Pa. Super. 2007)).

We begin with Appellant's challenge to the denial of his motion *in limine* which sought to exclude evidence of his January 2003 convictions for criminal trespass, theft by unlawful taking, and receiving stolen property. Appellant argues that evidence of these *crimen falsi* was inadmissible under Pa.R.E. 609, which provides as follows, in relevant part.

**(a) In General.** For the purpose of attacking the credibility of any witness, evidence that the witness has been convicted of a crime, whether by verdict or by plea of guilty or *nolo contendere*, must be admitted if it involved dishonesty or false statement.

**(b) Limit on Using the Evidence After 10 Years.** This subdivision (b) applies if more than 10 years have passed since the witness's conviction or release from confinement for it, whichever is later. Evidence of the conviction is admissible only if:

> (1) its probative value substantially outweighs its prejudicial effect; and

> (2) the proponent gives an adverse party reasonable written notice of the intent to use it so that the party has a fair opportunity to contest its use.

Pa.R.E. 609.

It is important to note what issues are not before this Court in deciding Appellant's first question. First, no one disputes that all three of the *crimen falsi* convictions admitted were more than ten years old for purposes of Rule 609, thus implicating subsection (b) of the Rule. Second, Appellant does not contend that he was given inadequate notice. Third, although Appellant references multiple *crimen falsi* convictions in his statement of questions presented, his argument relates solely to the admission of evidence of his criminal trespass conviction. Finally, Appellant does not contest that criminal trespass has been held to be a *crimen falsi*.

Therefore, the only issue presented by Appellant's first question is whether the trial court erred in holding that the probative value of his

criminal trespass conviction substantially outweighed its prejudicial effect. We conclude that the trial court did so err, but that the error was harmless.

In making the probative-value-versus-prejudicial-effect determination under Rule 609(b), a court considers the following factors.

> 1) the degree to which the commission of the prior offense reflects upon the veracity of the defendant-witness; 2) the likelihood, in view of the nature and extent of the prior record, that it would have a greater tendency to smear the character of the defendant and suggest a propensity to commit the crime for which he stands charged, rather than provide a legitimate reason for discrediting him as an untruthful person; 3) the age and circumstances of the defendant; 4) the strength of the prosecution's case and the prosecution's need to resort to this evidence as compared with the availability to the defense of other witnesses through which its version of the events surrounding the incident can be presented; and 5) the existence of alternative means of attacking the defendant's credibility.

*Commonwealth v. Palo*, 24 A.3d 1050, 1056 (Pa. Super. 2011) (quoting *Commonwealth v. Harris*, 884 A.2d 920, 925 (Pa. Super. 2005)).

Appellant argues that the probative value of the criminal trespass conviction did not substantially outweigh its prejudicial effect because (1) the connection of the offense to dishonesty is weak compared to other *crimen falsi* such as perjury or false identification; (2) there was a substantial danger that the jury would infer from the trespass conviction a propensity to enter areas where he did not belong; (3) more than one third of Appellant's life had passed between the time he was convicted of the trespass at age 20 and the time he would be impeached with the conviction; (5) the Commonwealth had at its disposal other means of attacking

Appellant's credibility, namely *crimen falsi* convictions that were less than ten years old. Appellant's Brief at 13-14.

Appellant's brief does not address the fourth factor: the strength of the Commonwealth's case and the availability of other witnesses. However, that factor was the primary focus of the trial court, which offered the following explanation of its reason for denying Appellant's motion in limine.

> Th[e trial] court considered the fact that, if [Appellant] chose to testify, [which he ultimately did,] his testimony would be of significant importance in the case. [Appellant] had recounted his "story" to Jeremy Springer, telling him how he had been at the Henderson residence the night Tony and Noelle had been murdered, that he had found their bodies, that he had attacked the DiVincenzo brothers and Sam Denillo with a baseball bat because he thought they were the perpetrators of the homicide coming back for him, and that he had disposed of evidence that he had removed from the crime scene. In light of this evidence, [Appellant's] credibility would be a critical issue, and the existence of the prior *crimen falsi* convictions would reflect directly upon his veracity. The existence of these prior convictions was not of such a nature that they would tend to smear [Appellant's] character, but simply to impeach his credibility. Because the prosecution's case against [Appellant] was largely circumstantial, the need to attack his veracity would have been crucial…. T[he trial] court also considered that the convictions at issue were ten and a half years old, not so far beyond the ten-year limitation to render them so remote as to be irrelevant and, although there was another *crimen falsi* conviction available to the Commonwealth for impeachment purposes, determined that the cumulative value of the *crimen falsi* convictions for purposes of impeachment substantially outweighed any prejudicial effect that might result from the use of those convictions for impeachment purposes.

TCO, 4/4/2014, at 12-13.

- 12 -

Considering Appellant's arguments and the trial court's reasoning, we agree with Appellant that the Commonwealth failed to establish that the probative value of this particular conviction for criminal trespass substantially outweighed its prejudicial effect. Given the availability of other, more recent *crimen falsi* convictions with which the Commonwealth could impeach Appellant, convictions which were less likely to suggest that Appellant had a propensity to commit the crime for which he was being tried, the probative value of this one conviction did not outweigh, let alone substantially outweigh, the prejudicial effect. However, the Commonwealth argues that the error was harmless, and we agree.

"The harmless error doctrine, as adopted in Pennsylvania, reflects the reality that the accused is entitled to a fair trial, not a perfect trial." *Commonwealth v. Hairston*, 84 A.3d 657, 671 (Pa. 2014) (quoting *Commonwealth v. Rasheed*, 640 A.2d 896, 898 (Pa. 1994)).

> Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Id.* at 671-72 (quoting *Commonwealth v. Hawkins*, 701 A.2d 492, 507 (Pa. 1997)).

Here, the jury was instructed specifically that Appellant's criminal convictions were to be considered only in assessing Appellant's credibility:

> There was evidence tending to prove that [Appellant] has a prior criminal conviction. I'm speaking of his conviction[s] for criminal trespass, theft and receiving stolen property. This evidence is not evidence of [Appellant's] guilt in this case. You must not infer guilt from the evidence of the prior convictions. This evidence may be considered for one purpose only, that is, to help you judge the credibility and weight of the testimony given by [Appellant] as a witness in this trial.

N.T., 9/9-13 & 16-18/2013, at 1295.

"The law presumes that the jury will follow the instructions of the court." *Commonwealth v. Miller*, 819 A.2d 504, 513 (Pa. 2002). Presuming that the jury followed the trial court's limiting instruction, the sole probative value of the criminal trespass conviction to the jury was its impeachment value. Therefore, the error of its admission is harmless because (1) any improper use of the criminal trespass conviction that the jury might have made was foreclosed by the limiting instruction, and (2) the evidence was cumulative of other *crimen falsi* convictions, the admission of which Appellant does not contest on appeal. Accordingly, we conclude that Appellant is not entitled to a new trial based upon the trial court's error in admitting evidence of his criminal trespass conviction.

Appellant next argues that the trial court erred in allowing the Commonwealth to publish the victims' autopsy photos to the jury twice: during the testimony of Dr. Wecht and during the testimony of police

Detective Ray Dupilka. Appellant claims that the photographs were gruesome and that, while concededly displayed properly during Dr. Wecht's testimony, they were "wholly unnecessary for Detective Dupilka's testimony." Appellant's Brief at 15.

> In determining whether to admit a photograph or videotape of a murder victim, a trial court must engage in a two-step analysis. First, the court must determine whether the photograph is inflammatory. If it is not, the photograph may be admitted if it has relevance and can assist the jury's understanding of the facts. If the photograph is inflammatory, the court must determine whether the essential evidentiary value of the photograph outweighs the likelihood that the photograph will improperly inflame the minds and passions of the jury.

*Commonwealth v. Patterson*, 91 A.3d 55, 67 (Pa. 2014) (citation omitted).

From Appellant's brief, we know nothing about the photographs at issue other than that they were from the victims' autopsies. Appellant does not discuss what exactly was shown in the photographs; what particular aspects rendered the photographs unnecessarily gruesome; or even whether the photographs were in color or black and white. Appellant appears to rely upon the fact that autopsy photographs are *ipso facto* disturbing. However, as our Supreme Court has noted:

> A criminal homicide trial is, by its very nature, unpleasant, and the photographic images of the injuries inflicted are merely consonant with the brutality of the subject of inquiry. To permit the disturbing nature of the images of the victim to rule the question of admissibility would result in exclusion of all photographs of the homicide victim, and would defeat one of the essential functions of a criminal trial, inquiry into the intent of

- 15 -

the actor. There is no need to so overextend an attempt to sanitize the evidence of the condition of the body as to deprive the Commonwealth of opportunities of proof in support of the onerous burden of proof beyond a reasonable doubt.

*Commonwealth v. Tharp*, 830 A.2d 519, 531 (Pa. 2003) (quoting *Commonwealth v. McCutchen*, 454 A.2d 547, 549 (Pa. 1982)).

Here, the trial court noted Appellant's failure to argue any inflammatory nature of the photographs as the basis for his objection to their admission, and explained that examination of the photographs was proper as part of Detective Dupilka's testimony:

> The testimony of Det. Dupilka authenticating the photographs and testifying about the circumstances under which the photographs were taken and, within his area of expertise [in crime scene investigation, processing, and forensics], what injuries were depicted in the photographs was proper, even though Dr. Wecht testified in more detail and within his area of expertise of forensic pathology as to the nature of the injuries he observed during the autopsy.

TCO, 4/4/2014, at 15.

Appellant has failed to convince us that the potential for prejudice outweighed the evidentiary value of the photographs, and that he is entitled to relief. *Commonwealth v. Wrecks*, 931 A.2d 717, 722 (Pa. Super. 2007) ("An appellant … has the burden to convince us that there were errors and that relief is due because of those errors."). Accordingly, we hold that Appellant's second issue is unavailing.

With his third question, Appellant challenges the admission of two instances of hearsay. First, he complains that the trial court erred in

overruling his objection to the testimony of Anna Stouffer. Stouffer was the woman who found the victim Henderson's wallet on the ground in front of Stouffer's parked vehicle, in the spot where a red car had been parked the night before. Not recognizing any of her neighbors as the owner of the wallet based upon the identification she found therein, Stouffer took the wallet to the police station. Stouffer offered the following testimony at trial, in pertinent part.

Q. Now, you said you had seen a woman leaving the red car and heading to 217 East Church Street before, did you ever learn who she was or what her name was?

A. Not until afterwards.

Q. After you found the wallet?

A. Yes.

Q. And what is her name?

A. Carly, um, Hall.

Q. Carly Hall?

A. Yes.

Q. Did you know her to be [Appellant's] wife?

A. I didn't know she was until afterwards.

Q. After you turned the wallet in?

A. Yes.

Q. And did you advise her the wallet had been found?

A.    I told her I had found a wallet and that I turned it into the police station.

* * *

Q.    You indicated that you learned the name Carly Hall after the fact?

A.    Yeah, I do not go around and ask.  I'm not nosey.

Q.    How did you find that out?

A.    Um, I'm not sure exactly if somebody had told me.  It could have been the neighbor downstairs because she was a busybody.

N.T., 9/9-13 & 16-18/2013, at 667-68, 671-72.  Appellant then objected and moved to strike Stouffer's identification of Carly Hall "because of the hearsay nature of her knowledge."  **Id.** at 672.  The trial court overruled the objection.  **Id.** at 673.

"Hearsay is an out-of-court statement offered to prove the truth of the matter asserted in the statement."  **Commonwealth v. Kuder**, 62 A.3d 1038, 1055 (Pa. Super. 2013).  "However, [w]hen a hearsay statement is offered for a purpose other than proving the truth of its contents, it is not hearsay and is not excludable under the hearsay rule."  **Commonwealth v. Dargan**, 897 A.2d 496, 500 (Pa. Super. 2006) (internal quotation marks and citation omitted).

Here, the Commonwealth argues that the claimed hearsay statements were not offered to prove the truth of the matters asserted. Commonwealth's Brief at 22.  It maintains that Stouffer's testimony as to

Carly Hall's identity was not offered to prove that the resident of 217 East Church Street was in fact Carly Hall; rather, it was offered to establish that Stouffer gave the resident of that address information about a lost wallet that had been turned in to the police, and that Stouffer believed that person to have been Carly Hall.

The trial court, on the other hand, agreed with Appellant that Stouffer's identification testimony was hearsay, but opined that the error of its admission was harmless. The trial court noted that it was the testimony of Appellant's landlord and Appellant himself that established that he and Carly Hall lived at 217 East Church Street during the relevant time. TCO, 4/4/2014, at 17.

We hold that the trial court did not err in refusing to strike Stouffer's identification of Carly Hall as the woman who drove the red car and to whom Stouffer spoke about the wallet. First, it is not clear from the record that Stouffer's knowledge of the name of her neighbor actually was based upon an out of court statement; Stouffer testified that she was not sure whether someone told her. Second, even if it were, Stouffer's testimony was not offered to prove that Carly Hall was indeed the name of the woman in question. Whether Stouffer believed her name to be Carly Hall, Jane Doe, or any other name was of no import; Stouffer had personal knowledge that the woman who lived at 217 East Church Street drove the red car that had been parked where she subsequently found the wallet, and she knew that she told

that woman about finding the wallet and taking it to the police. To the extent that Appellant claims that Stouffer's identification of Carly Hall as the owner of the red car "was a crucial piece of circumstantial evidence which the Commonwealth used to link [Appellant] with the crime[,]" his argument is fatuous.

Appellant makes similar unavailing claims as to the purported hearsay testimony of Jeremy Springer, who offered the following testimony related to the wallet, during which Appellant lodged hearsay objections to the statements attributed to Carly Hall.[1]

> Q. Let me just ask you about the wallet again that [Appellant] said he took off of the coffee table. Did you have any subsequent conversations with [Appellant] about that wallet? Did it ever come up in conversation again?
>
> A. Um, after the fact. Um, [Appellant] and I were together and his wife had called him.
>
> Q. Do you remember where you were?
>
> A. In Greensburg and we had made -- she had called him to ask him if he had lost his wallet.
>
> * * *
>
> Q. Could you hear what Carly was saying?
>
> A. [Appellant] had told me what she said.
>
> Q. Okay. Would you tell us what [Appellant] told you what Carly said?

---

[1] Appellant does not contest that his out-of-court statements, relayed by Springer, were admissible. Appellant's Brief at 16.

* * *

A. He had stated that she had asked him if that was his wallet. He said no, I have my wallet on me, why. She said the neighbor just found a wallet outside on the sidewalk and didn't know if it was yours. He had then said no, I have my wallet. Then he hung up the phone and a few minutes later he called her back and said I think that is my wallet. He then made reference that might have been Tony's wallet if it fell out when he was cleaning up his Jeep.

Q. So he told Carly?

A. It might have been my wallet. It might be my wallet. And she said, well, that person already left and went to the police station to turn it in.

N.T., 9/9-13 & 16-18/2013, at 973-76.

The Commonwealth argues that Springer's recitation of what Appellant said Carly Hall had told him about the wallet was also not offered to prove that Carly Hall in fact had a conversation with a neighbor about the wallet, or that the neighbor took the wallet to the police. Rather, the statements put Appellant's responses in context. Commonwealth's Brief at 24. Or, as the trial court put it, Carly Hall's statements were offered "merely to establish that they were said at all, as an explanation for [Appellant's] response and his statements to Springer." TCO, 4/4/2014, at 18.

We agree that it was not error to admit Appellant's statements about what Carly Hall had told him. Out-of-court statements offered to explain the conduct of a witness or of the police are not hearsay "because they are offered not for the truth of the matters asserted but rather to show the

information upon which [the witness or] police acted." ***Commonwealth v. Trinidad***, 96 A.3d 1031, 1037 (Pa. Super. 2014) (quoting ***Commonwealth v. Weiss***, 81 A.3d 767, 806 (Pa. 2013)). It was irrelevant whether Carly Hall's statements to Appellant were true or false, and they were not offered to prove that a neighbor did in fact speak to Carly Hall about finding a wallet. Rather, the statements were offered to show the information upon which Appellant acted. Because the statements were not offered for the truth of the matters asserted, they were not inadmissible hearsay. Appellant's hearsay arguments entitle him to no relief.

Appellant next claims that the trial court erred in admitting text messages that were sent and received on Appellant's mobile phone because they were not properly authenticated. Appellant's Brief at 16-17. The text messages were, in large part, between Appellant's phone and that of his mother, and concerned a gun of hers that Appellant had had in his possession.

> [E]-mails and text messages are documents and subject to the same requirements for authenticity as non-electronic documents generally. A document may be authenticated by direct proof, such as the testimony of a witness who saw the author sign the document, acknowledgment of execution by the signer, admission of authenticity by an adverse party, or proof that the document or its signature is in the purported author's handwriting. A document also may be authenticated by circumstantial evidence, a practice which is uniformly recognized as permissible.

*Commonwealth v. Koch*, 39 A.3d 996, 1004 (Pa. Super. 2011), *allowance of appeal granted*, 44 A.3d 1147 (Pa. 2012)[2] (citations and quotation marks omitted). "[A]uthentication of electronic communications, like documents, requires more than mere confirmation that the number or address belonged to a particular person. Circumstantial evidence, which tends to corroborate the identity of the sender, is required." *Id.* at 1005.

Appellant's argument, citing generally to the testimony of Detective Robert Weaver, through whom the text messages were admitted, is as follows in its entirety.

> In the instant case, the Commonwealth really didn't offer any authentication apart from the fact that the phone from which the text messages were sent had been used by [Appellant]. It is clear, however, that more people than just [Appellant] had used the phone. In fact, the phone itself was not even in [Appellant's] name; it was in his brother, Jay's name. Some of the text messages that were obtained from the phone indicated that it was actually Jay who had sent such messages. Similarly, there was testimony at trial that one of [Appellant's] friends, Jeff Golden, had used the phone on the very day on which the text messages being introduced had been sent. Some texts from Jay Hall were likewise sent the same day as the messages being introduced. These facts beg the question: how can we know that [Appellant] sent the texts being offered into evidence? The answer is simple: we can't.

Appellant's Brief at 17.

The trial court offered the following reasons for its determination that the text messages at issue had been sent by Appellant.

---

[2] Although our Supreme Court granted allowance of appeal on May 17, 2012, as of the date of filing, the Court has not handed down its decision. We therefore follow this Court's precedential opinion in *Koch*.

First of all, although the phone was in Jay Hall's name, it was clear that the phone was used by [Appellant] continuously.

\* \* \*

Also, although Jeff Golden testified that he did use the phone, he used it in the presence of [Appellant]. I believe he was asked, I think by the defense, if he had ever used that phone any other time. He stated, no, just that one time. That he was, I think, going to Tony Henderson's home with [Appellant] and he used the phone.

Although Jay Hall used the phone that morning, again, he clearly stated as the testimony came out that his is Jay talking to his girlfriend. Those of us who use cell phones continuously, if we don't have access to our own [and] are borrowing someone else's, I think all of us say, hey, it's me so the person who received the message knows it's from someone else, not the person [by] whom the phone normally is being used. Jay identified himself to his girlfriend, used it for a short period of time and then he clearly said he was going somewhere for the rest of the day.

I think the contents of the messages again authenticates it. All you need for authentication is circumstantial evidence and there is certainly an abundance of circumstantial evidence here.

Detective Weaver interviewed [Appellant's mother] and [she] stated to Detective Weaver that she had given the gun to [Appellant] and so certainly that would be circumstantial evidence that [Appellant] was talking about the gun to his mother and not one of her other sons. …

Given what the conversations are and the other texts that the Commonwealth is not attempting to get in, [Appellant] to his fiancée Carly back and forth and to his brothers, it's clear that it is [Appellant] who is speaking….

N.T., 9/9-13 & 16-18/2013, at 946-48.

The trial court's determinations are supported by the record. Thus,

Appellant's contention that the Commonwealth offered no authentication

evidence is incorrect. Because we discern no error in the trial court's conclusion that circumstantial evidence corroborated that Appellant sent the text messages in question from the phone which was seized from him, his fourth issue entitles him to no relief.

With his fifth question on appeal, Appellant argues that Jeremy Springer's testimony about Appellant's refusal to speak with police violated Appellant's right to remain silent guaranteed by the United States and Pennsylvania constitutions. Appellant's Brief at 17-19.

> Both the United States Constitution and the Pennsylvania Constitution protect every person against being compelled to be a witness against himself or herself. This privilege protects a defendant from being compelled to speak before arrest. Further, the privilege prohibits the prosecution from using a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged as such use infringes on a defendant's right to be free from self-incrimination.

***Commonwealth v. Guess***, 53 A.3d 895, 903 (Pa. Super. 2012) (internal quotation marks and citations omitted).

Appellant argues that his right to pre-arrest silence was violated by the Commonwealth's introduction of Jeremy Springer's testimony that, after Appellant told him that he stumbled upon a murder scene, he repeatedly encouraged Appellant to tell the police what Appellant had witnessed, but Appellant refused to go to the authorities. Appellant claims that the Commonwealth impermissibly used this evidence of his pre-arrest silence as substantive evidence of guilt. Appellant's Brief at 18. Appellant, relying on

*Commonwealth v. Molina*, 33 A.3d 51 (Pa. Super. 2011) (*en banc*), *appeal granted*, 51 A.3d 181 (Pa. 2012), claims that this constitutional violation entitled him to relief.

In *Molina*, Molina was tried and convicted for the murder of Melissa Snodgrass. At trial, the Commonwealth introduced evidence that the authorities had contacted Molina regarding the disappearance of Snodgrass, but Molina had refused to be interviewed. Molina did not testify at trial, and he did not raise the adequacy of the police investigation as a defense. *Id.* at 61. During closing arguments, the Commonwealth commented on Molina's lack of cooperation and posed the question "why?" to the jury. After Molina's objection was overruled, the prosecutor advised the jury to "factor that in" during deliberations. *Id.* at 54. On Molina's appeal, this Court held "the Commonwealth cannot use a non-testifying defendant's pre-arrest silence to support its contention that the defendant is guilty of the crime charged[.]" *Molina*, 33 A.3d at 62.

*Molina* is materially distinguishable from the instant case. Because Appellant waived his right to remain silent and testified in his defense, N.T., 9/9-13 & 16-18/2013, at 1075-1212, the holding of *Molina* regarding the rights of a non-testifying defendant is inapplicable. Our Supreme Court has held specifically that "when a criminal defendant waives his right to remain silent and testifies at his own trial, neither the United States nor the Pennsylvania Constitution prohibit[s] a prosecutor from impeaching a

defendant's credibility by referring to his pre-arrest silence." ***Commonwealth v. Bolus***, 680 A.2d 839, 844 (Pa. 1996).

Further, our courts have rejected the notion "that impeachment is the sole permissible purpose for which a defendant's pre-arrest silence may be referenced by the Commonwealth in a criminal trial."[3] ***Commonwealth v. DiNicola***, 866 A.2d 329, 336 (Pa. 2005). For example, the Commonwealth may introduce evidence of pre-arrest silence in response to a defendant's argument or cross-examination of a witness at trial. ***See, e.g., DiNicola***, 866 A.2d at 336 (holding that the defendant opened the door to reference to his refusal to cooperate with police because his strategy at trial had been "to question the government's preparation of its case, particularly in terms of the investigating trooper's pursuit of potentially exculpatory evidence"); ***Fischere***, 70 A.3d at 1280 (holding that the Commonwealth was permitted to reference Fischere's refusal to give a second interview after, on cross-examination, counsel for Frischere "engaged in the line of questioning that inquired into why law enforcement did not conduct a more comprehensive interview").

The instant case is more akin to ***Commonwealth v. Adams***, 39 A.3d 310, 319 (Pa. Super. 2012), *appeal granted*, 48 A.3d 1230 (Pa. 2012), than

---

[3] Indeed, this Court recently interpreted the case law so broadly as to state "it does not violate the Fifth and Fourteenth Amendments when the prosecution uses a defendant's pre-arrest silence if he or she testifies in his or her own defense." ***Commonwealth v. Fischere***, 70 A.3d 1270, 1276 (Pa. Super. 2013).

to **Molina**. In that case, Adams challenged the following reference to his pre-arrest silence offered during the Commonwealth's case by the police detective who had investigated the murder for which Adams was being tried.

[Q]: During your investigation, did you have the occasion to locate [Adams]?

[A]: Yes.

* * *

[Q]: And did you attempt to interview [Adams]?

[A]: Yes we did; however, he didn't want to speak to us at that time.

[Q]: Did you identify yourselves as law enforcement?

[A]: Yes. We identified ourselves and told him that we'd like to interview him in reference to the [victim's] homicide and that his name came up in the matter.

[Q]: And in response to that what did he say?

[A]: He said he had nothing to say.

[Q]: What then—did you have a further conversation with him?

[A]: Yes. We also asked him to consent to provide us with a DNA sample with the use of a DNA collector at which time he agreed.

*Id.* at 315. On appeal, this Court held that the references to Adams' pre-arrest silence did not violate his constitutional rights. The testimony "was offered for a narrow purpose, namely to demonstrate the nature and focus of the investigation, and as foundational evidence demonstrating how the police came to obtain [Adams'] DNA sample, which was later admitted into

evidence at trial." **Id.** at 319. Further, the officer's references "were limited in context, and neither [the officer] nor the Commonwealth implied that [Adams'] silence constituted a tacit admission of guilt." **Id.**

Here, the Commonwealth, through Springer, did not offer evidence of Appellant's pre-arrest silence as substantive evidence of Appellant's guilt. Rather, the Commonwealth elicited the testimony "to explain the cause of the delay that occurred before Jeremy Springer came to the authorities with the information provided by [Appellant] concerning the homicides and to explain that Jeremy Springer struggled with the information in determining what he needed to do." Commonwealth's Brief at 28. Further, unlike in **Molina**, "nowhere in the Commonwealth's closing was there reference made to [Appellant's] refusal to talk to authorities or argument made that it was implicit [evidence] of [Appellant's] guilt." **Id.** at 31. We agree with the Commonwealth that Appellant's reliance upon **Molina**'s holding as to the use as evidence of guilt of the pre-arrest silence of a non-testifying defendant is misplaced.

Even if evidence of his pre-arrest silence were admitted improperly before Appellant testified, the error was harmless. When Appellant took the stand, he not only was asked by his counsel on direct examination about why he did not contact the police immediately after leaving the home of Henderson and Richards, N.T., 9/9-13 & 16-18/2013, at 1120, 1138, but he was impeached permissibly with his pre-arrest silence, without objection, by

the Commonwealth on cross-examination, *id.* at 1191-92. Appellant's choice to testify in his own defense allowed the Commonwealth to point to his pre-arrest silence for impeachment. Thus, the evidence offered by Springer was merely cumulative of evidence which was unquestionably admitted properly. Therefore, Appellant would not be entitled to relief even if his objection to Springer's testimony had been overruled in error. ***See, e.g., Commonwealth v. Hardy***, 918 A.2d 766, 777 (Pa. Super. 2007) (finding harmless error where the same evidence erroneously admitted over objection was later admitted properly through another witness).

Appellant's final question posed to this Court is whether the trial court erred in allowing the Commonwealth to impeach Appellant on a collateral matter with extrinsic evidence. Appellant's Brief at 19. The factual basis for this issue is as follows.

During the Commonwealth's cross-examination, Appellant testified that, although he in fact had a firearm in his home when the police executed the search warrant seeking, *inter alia*, firearms, he did not remember being asked whether he had any firearms in the house. N.T., 9/9-13 & 16-18/2013, at 1195-96. Appellant indicated that the statement that he was asked that question was "a lie" as it "never happened." ***Id.*** at 1196. Further, Appellant testified that if a police officer reported that Appellant affirmatively denied having a gun in the home at the time of the search, that was also untrue. ***Id.***

After the defense rested, the Commonwealth offered, over Appellant's objection, the rebuttal testimony of Detective Terrence Kuhns. Detective Kuhns testified that, before the officers began searching Appellant's property, he twice asked Appellant whether he had any firearms in the apartment. *Id.* at 1218-19. According to Detective Kuhns, Appellant twice indicated that he had no guns in the apartment. *Id.* at 1219.

While Appellant offers ample argument to support his contention that the trial court erred in admitting the rebuttal testimony of Detective Kuhns, he offers absolutely no argument or explanation of how he was prejudiced by the error such that he did not receive a fair trial. "Even when a defendant can prove an error in the admission or exclusion of testimony, it is not enough to warrant a new trial unless he can also prove that he was prejudiced by such error." *Commonwealth v. Beltz*, 829 A.2d 680, 683 (Pa. Super. 2003). As the record contains no indication that the outcome of the case would have been different had the trial court excluded Detective Kuhns' testimony, Appellant is entitled to no relief.

Finally, in the conclusion section of his brief, Appellant argues that "even if this Court determines that the errors herein are not sufficient alone to award a new trial, … the cumulative effect thereof is enough" to warrant a new trial. Appellant's Brief at 21. Appellant raised this claim of cumulative prejudice neither in his 1925(b) statement nor in his statement of questions presented. Accordingly, the issue is waived. *See* Pa.R.A.P. 1925(b)(4)(vii)

(providing issues not raised in the statement of errors complained of on appeal are waived); Pa.R.A.P. 2116 ("No question will be considered unless it is stated in the statement of questions involved or is fairly suggested thereby.").

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.

Prothonotary

Date: 12/16/2014